IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff-Respondent,

  vs.                                    CIVIL NO. 08-352 BB/LFG
                                             CRIM. NO. 04-2395 BB

GLENN DELL COOK,

       Defendant-Movant.

### MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

### Findings

1.  This is a proceeding on a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, filed April 3, 2008.  Movant Glenn Dell Cook ("Cook") challenges the judgment and sentence entered by the United States District Court for the District of New Mexico in United States v. Cook, No. CR 04-2395 BB, on grounds of ineffective assistance of counsel.

2.  The Government submitted its Response [Doc. 16] on July 11, 2008, followed by a set of exhibits filed on July 17, 2008 [Doc. 19].  On July 25, 2008, Cook filed his Reply [Doc. 20].  The Motion is now fully briefed.

### Factual and Procedural Background

3.  On August 26, 2004, New Mexico State Police officers executed a search warrant on a

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

motel room at the Lea County Inn in Hobbs, New Mexico.  Upon entering the second-floor room, the officers observed three men attempting to escape by climbing out the window.  Joseph Gilkey ("Gilkey") and Darrell Adams ("Adams") got out, but both were apprehended shortly thereafter. Cook also jumped out the window and injured both of his ankles.  He was transported to the hospital for treatment.  The search of the motel room that day revealed approximately two pounds of marijuana, scales, bags used to package narcotics, and a .45 caliber handgun.

4.  The next day, a drug agent conducted a second search in response to reports by motel employees of a suspicious person attempting to gain access to the motel room.  The agent was given permission by motel management to return to the room.  In this second search, the agent found sixteen small plastic bags hidden in the air conditioning/heating unit.  These bags contained 427.55 grams of a substance which was later found to be a mixture containing approximately 236 grams of pure methamphetamine.  Cook's co-defendant Adams later testified that he is the person who hid the methamphetamine in the air conditioning unit.

5.  Cook's other co-defendant, Gilkey, admitted that he and Adams stole approximately one pound of methamphetamine, five pounds of marijuana, and a handgun from a man in California. They both claim that after the theft they contacted Cook, who was also in California at the time and who recommended that they go to Hobbs where the methamphetamine could be sold for a higher price than in California.  The three men then traveled to Hobbs in a rental car, while an associate, Rommie Faye Rogers, drove a separate car containing the drugs.  Gilkey and Adams say that Cook used his contacts in New Mexico to distribute the drugs from the motel room at the Lea County Inn. The room had been rented by Erica Benavides, a friend of Cook's.

6.  Cook claims that he knew nothing about the methamphetamine and had no involvement with any drug distribution scheme.  He says he jumped from the motel room window when the

police arrived, in order to avoid arrest for the small amount of marijuana he had in the motel room for his personal use.

7.  On December 1, 2004, Cook was charged in a three-count indictment with conspiracy to possess with intent to distribute 50 grams or more of methamphetamine and less than 50 kilograms of marijuana; possession with intent to distribute 50 grams or more of methamphetamine; and possession with intent to distribute less than 50 kilograms of marijuana.  [Doc. 33 in CR 04-2395].[2]

8.  Cook denies the indictment's allegations that he went to Hobbs with his two co-defendants, Gilkey and Adams, for the purpose of selling methamphetamine and marijuana.  He contends that the drugs found in the hotel room belonged to Gilkey and Adams, who stole them in California and brought them to Hobbs.  Cook denies the allegation that he was part of a conspiracy to distribute drugs in Hobbs after they were stolen.  He maintains that Gilkey and Adams are career criminals who testified against him in exchange for greatly reduced sentences. [Doc. 1, at 4].

9.  Following Cook's arrest, he was represented by a series of different attorneys.  After the Federal Public Defender notified the Court of a conflict of interest, Cook's second attorney was Bernadette Sedillo ("Sedillo") who on September 3, 2004 was appointed under the Criminal Justice Act ("CJA").  [CR Doc. 4].  On October 19, 2004, Sedillo filed a Motion to Withdraw as Counsel for Cook on grounds that:

> Defendant and counsel are in direct conflict regarding counsel's judgment and recommendations about defense strategy options. Defendant has repeatedly expressed his dissatisfaction and displeasure with counsel and has requested that counsel ask the Court to appoint him a different lawyer.  The lawyer/client relationship has deteriorated to the point that defense counsel cannot effectively communicate with Mr. Cook, and the inability to effectively

---

[2]Hereinafter, documents filed in CR 04-2395 BB will be cited in the format, "CR Doc. ___"; documents filed in the instant civil action, Civ. 08-352 BB/LFG, will be cited simply as "Doc. ___."

communicate with Mr. Cook is hindering his defense.

[CR Doc. 23].

10.   On October 27, 2004, Sedillo was permitted to withdraw as counsel for Cook, and on

November 1, 2004, attorney Mario A. Esparza ("Esparza") was appointed under the CJA to replace

Sedillo. [CR Docs. 23, 26, 27].  Esparza represented Cook at the arraignment on December 9, 2004

where Cook pled not guilty and was ordered detained pending trial. [CR Doc. 34].

11.   On February 9, 2005, Esparza filed a Motion to Withdraw as Counsel [CR Doc. 54].

As grounds for the motion, Esparza stated: "Defendant and Defense Counsel have differing views

in reference to trial strategy for the above referenced matter.  Further, Defendant has contacted

Defense Counsel and informed him that he no longer wants Defense Counsel as his attorney.  In

light of these facts, irreconcilable differences have arisen between undersigned counsel and

Defendant." [Id., at 1].  On February 17, 2005, the Court permitted Esparza to withdraw on grounds

of irreconcilable differences. [Doc. 55].

12.   On February 22, 2005, attorney Carmen Garza ("Garza") was appointed under the CJA

to take Esparza's place as counsel for Cook.  [CR Doc. 57].  On March 2, 2005, Garza asked to

withdraw as counsel.  [CR Doc. 58].  The motion was granted on March 14, 2005. [CR Doc. 62].

13.   That same date, March 14, 2005, attorney Louis Elias Lopez ("Lopez") of El Paso,

Texas, was appointed under the CJA to represent Cook. [CR Doc. 64].  On April 6, 2005, Lopez

filed a motion to withdraw as counsel for Cook, stating that he met with Cook on April 5, 2005, at

which time "the Defendant informed Mr. Lopez that he already retained a private counsel and

refused to speak with  the undersigned counsel." [CR Doc. 66, at 1].  Lopez said further that,

"Defendant stated that Mr. Lopez was unable to represent him and that all the Court appointed

lawyers are not competent to represent him.  Defendant became angry and upset and informed Mr.

4

Lopez that he has thrown away all office correspondence mailed to him." [Id.].

14.   A Motion to Substitute Attorney of Record [CR Doc. 67] was also filed on March 14, 2005.  The motion requested that retained counsel Robert R. Harris ("Harris") of El Paso, Texas, and R. Morgan Lyman ("Lyman") of Las Cruces, New Mexico be substituted as attorney for Cook. Lopez's motion to withdraw, and Cook's motion to substitute Harris and Lyman as counsel, were both granted on April 8, 2005. [CR Docs. 70, 71].

15.   On April 25, 2005, the Court issued an Order setting jury selection and trial for May 24, 2005. [CR Doc. 74].  On April 28, 2005, Harris filed a Motion for Continuance [CR Doc. 75].  In this Motion, Harris asked that the "sentencing," set for "May 23, 2005" be continued, as counsel had two jury trials scheduled in Texas state courts, one beginning May 23 and the other to commence on May 31. [Id.].

16.   In his May 9, 2005 Order denying the request for continuance, United States District Judge Bruce D. Black noted that no "sentencing" was scheduled in Cook's case on May 23, and that presumably counsel intended to ask for a continuance of the trial set to begin May 24.  Judge Black noted:

> The Court finds continuing trial in this matter yet again troublesome. Defense counsel's motion does not indicate whether the Defendant has waived his speedy trial rights, nor does he cite the proper statute. Defendant has been in custody since September 2, 2004, has had at least three attorneys appointed to represent him earlier in the case, and has sought and obtained four previous trial continuances.  Given these facts, the Court will deny the motion and trial will proceed in this matter, as scheduled, for May 24, 2005 at 9:00 a.m.  The Court will, however, attempt to work around counsel's prior commitments in Texas state court.

[CR Doc. 76, at 1-2].

17.   A second attempt by Harris to have the trial continued was denied by Judge Black on

5

May 18, 2005 on grounds that the concerns expressed in the earlier Order had not been addressed, and Harris had not explained why co-counsel Lyman, an experienced local attorney, could not conduct the defense.   The Court concluded, "If lead defense counsel finds this arrangement untenable, the Court may consider an early June trial setting in Albuquerque." [CR Doc. 78, at 1]. There is no indication that Harris responded to this suggestion, and the case proceeded to trial on May 24, 2005.   On May 25, 2005, the jury returned a verdict of guilty against Cook on all three counts of the indictment. [CR Doc. 90].

18.   On August 29, 2005, attorney Eduardo Solis of El Paso, Texas entered his appearance as retained counsel on behalf of Cook. [CR Doc. 104].   Attorney Harris continued to represent Cook during the sentencing process, apparently working in conjunction with attorneys Solis and Lyman. Harris filed objections to the presentence report.   The Clerk's Minutes for the September 6, 2005 sentencing hearing indicate that Solis and Lyman appeared on behalf of Cook.   [CR Docs. 105, 108]. Cook was sentenced to a total term of imprisonment of 235 months.   Judgment was entered on September 8, 2005. [CR Docs. 108, 109].   Harris filed a Notice of Appeal on Cook's behalf on September 9, 2005.   [CR Doc. 112].

19.   Also on September 9, 2005, Harris filed a Motion to Withdraw [CR Doc. 110] as counsel.   In the motion, Harris noted:

> Defendant believes it would be in his best interest to have counsel appointed to represent his interests on appeal with the Tenth Circuit Court of Appeals.   Defendant's counsel filed several motions and presented objections and argument at an evidentiary sentencing hearing in this cause, which did not meet with success.   Defendant wishes to have new and different appointed counsel review the record in its entirety, to include undersigned counsel's performance at the trial court level throughout.

[Id., at 1].   The Motion to Withdraw was granted by the District Court on September 14, 2005 [CR

Doc. 113].

20.  The appeal proceeded.  On December 20, 2005, the United States Court of Appeals for the Tenth Circuit granted Cook's motion to allow Harris to withdraw as counsel; the Colorado Federal Public Defender (apparently attorney Howard Pincus) was appointed as counsel for Cook for purposes of the appeal. [*See* CR Doc. 123].  On February 22, 2005, the Court of Appeals granted a motion to substitute Leon Schydlower ("Schydlower") as retained appellate counsel for Cook on the appeal. [*See* CR Doc. 126].  Subsequently, on May 12, 2006, the Court of Appeals granted Schydlower's motion to withdraw and to have attorney Robert Perez substituted. [*See* CR Doc. 129].

21.  The issues presented on appeal went to sentencing matters.  The Tenth Circuit rejected Cook's arguments and affirmed his conviction in an Order and Judgment dated March 29, 2007. [*See* CR Doc. 130].

22.  Cook now brings this Motion to Vacate under 28 U.S.C. § 2255, arguing Harris's representation at trial was constitutionally ineffective.  Cook contends that trial counsel was ineffective in numerous ways, including his:  (a) failure to conduct a proper pretrial investigation; (b) failure to file and respond to pretrial motions; © failure to object to prosecutor's improper leading questions and improper use of evidence; (d) failure to adequately cross-examine co-Defendants; (e) failure to object to improper expert testimony; (f) failure to object to prosecutor's improper arguments in the closing statement; (g) failure to give an opening statement for the defense; (h) failure to prepare Cook for his trial testimony; (I) failure to object to improper rebuttal witness; (j) failure to provide an adequate closing statement; and (k) Cumulative error.

23.  Cook requests an evidentiary hearing.

<u>Discussion</u>

24.  To establish ineffective assistance of counsel, Cook must make a two-pronged showing;

(1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced his defense in that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result.  Strickland v. Washington, 466 U.S. 668, 687 (1984).

25.  To prove deficient performance, Cook must overcome the presumption that counsel's conduct was constitutionally effective.  Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir. 1998).  Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight.  Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995).  In order to be found constitutionally ineffective, counsel's performance must be shown to have fallen below an objective standard of reasonableness.  Strickland, at 687-88.  In addition, the burden is on the petitioner to show prejudice – that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id., at 694.

26.  The Court addresses separately each of the above-noted allegations of ineffective assistance of counsel.

### A.
### *Failure to Conduct Proper Pretrial Investigation*

27.  Cook claims that his attorney failed to adequately investigate the facts of the case prior to trial.  In particular, he faults Harris for not consulting with and obtaining the file of Bernadette Sedillo, the first lawyer appointed to represent Cook in this case after withdrawal of the public defender.

28.  Cook asserts further that Harris failed to interview potential witnesses for the defense and presented only one witness at trial (other than Cook himself).  Cook contends that Harris should have interviewed the following people:  employees of the Lea County Inn to determine what they had seen and heard; Erica Benavides ("Benavides"), an employee at Comfort Inn in Hobbs who

rented the hotel room used by Cook and his co-defendants; Derek Collins ("Collins"), a friend of

Benavides; and Cook's girlfriend (whose name does not appear in the record), "who could confirm

or deny" that Cook was planning to return to California as soon as possible and therefore would not

have returned to the hotel room to retrieve drugs left by Adams.

29.  Finally, under the heading of failure to investigate, Cook faults Harris for failing to

acquire "a clear set of photographs" from the police, instead using photocopies.  This deprived the

defense of the opportunity to develop exculpatory evidence.

30.  The Government submitted the affidavit of attorney Harris with its Answer.  In this

affidavit, Harris states that he conducted a thorough investigation, speaking to Cook numerous times

and contacting Cook's cousin Martha Wright, who testified at trial.  Harris also states that he

diligently sought to locate Benavides and Collins but was unsuccessful.  He says further that

although Cook's girlfriend was not called to testify, he believes she was in the courtroom during the

trial.  [Doc. 19, Ex. 1, at 1].

31.  The United States Supreme Court has set forth defense counsel's duty with respect to

pretrial investigation:

> [C]ounsel's function, as elaborated in prevailing professional norms,
> is to make the adversarial testing process work in the particular case.
> Because that testing process generally will not function properly
> unless defense counsel has done some investigation into the
> prosecution's case and into various defense strategies, . . . counsel has
> a duty to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary. But . . . a
> particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of
> deference to counsel's judgments.

Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (internal punctuation and citations omitted).

32.  Petitioner has the burden of showing the existence of favorable evidence, or what an

investigation would have revealed that might have changed the outcome of the case. <u>Gordy v. Hargett</u>, 37 Fed. Appx. 437, 439 (10th Cir. 2002). That is, Cook must show that if Harris had done more extensive investigation or had called the witnesses Cook claims he should have called, the result of the trial would have been different. <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1089 (9th Cir. 2001) ("Bragg did not show a reasonable probability that, but for [counsel's] alleged investigative omissions, the result would have been different. Bragg fails to satisfy the prejudice prong because any prejudice from any investigation error does not sufficiently undermine confidence in the jury's verdict").

33. The decision whether to call a witness generally rests within the sound discretion of trial counsel, <u>Jackson v. Shanks</u>, 143 F.3d 1313, 1320 (10th Cir. 1998), and such decisions involving trial tactics and strategy are "virtually unchallengeable." <u>Strickland v. Washington</u>, 466 U.S. 668, 690 (1984). It may be error to fail to call a witness in some limited situations, for example, "when that witness would present the only defense available." <u>United States v. Miller</u>, 643 F.2d 713, 714 (10th Cir. 1981). But there is no error if the testimony would be merely cumulative, or if "it is at least as reasonable, and maybe more so, to speculate that the testimony of those witnesses would have damaged defendant's case, given the possibility of harmful statements . . . and their vulnerability on cross-examination." <u>United States v. Snyder</u>, 787 F.2d 1429, 1432 (10th Cir. 1986).

34. As noted above, Harris was appointed to represent Cook on April 8, 2005. Cook had previously gone through several other attorneys, three of whom sought to withdraw because of breakdowns in the attorney-client relationship. Harris filed two motions to continue the trial date, but these were denied and the case proceeded to trial on May 24, 2005. Thus, Harris's opportunity to conduct his own pretrial investigation was somewhat limited due to time constraints. Nonetheless, he had several meetings with Cook, he interviewed Martha Wright, and he sought

unsuccessfully to locate the other potential witnesses.

35.  Cook asserts that Harris failed to consult with and obtain the file of Sedillo, the first attorney appointed to represent Cook.  Cook says that Sedillo did some investigation on the case.  However, he does not indicate what Sedillo found out, or even what she might have found out, that would have been helpful to the defense.  If Harris failed to obtain some information from Sedillo which might have turned the tide at trial, Cook has not explained what that information was and what effect it might have had on the outcome.

36.  Cook does not name any particular employee of the Lea County Inn whose testimony could have helped the defense, and he does not point out what any such employee might have said that would have persuaded the jury to acquit.  Cook contends only that Harris did not talk to potential witnesses Benavides and Collins, nor did he speak to Cook's girlfriend.  Harris says that he attempted to locate Benavides and Collins but apparently was unsuccessful.  It is unclear what Benavides or Collins would have added to the defense case if they had been called to testify; Cook does not give any hint as to what they might have said or how their testimony would have turned the tide at trial.

37.  The evidence adduced at trial indicated that Benavides was a friend or acquaintance of Cook's.  She was an employee at the Comfort Inn where Adams and Gilkey, and perhaps Cook, stayed the first night they were in Hobbs.  She secured a room for the men at the Comfort Inn for the first night, and then rented the room for them at the Lea County Inn where they were later arrested.  Cook's co-defendants testified that Benavides and Collins were part of the scheme to distribute the drugs in Hobbs.  [Trial Transcript (hereinafter, "Trial Tr.") 94-96, 122-123, 125-128, 194-95, 259-60, 275].

38.  Cook testified that he recognized Benavides when he and the other two men pulled up

11

to the Comfort Inn upon first arriving in Hobbs, and that she rented a room for them. [Trial Tr. 194-95, 225].  He says he never saw Collins the entire time he was in Hobbs. [Trial Tr. 225-26].  Cook's co-defendants testified that Benavides rented both rooms for them and that this had been arranged in advance.  [Trial Tr. 94-96, 122-23, 259-60, 275].  Cook testified further that he spent the first night at his cousin's house and when he returned to the Comfort Inn the next day, Benavides told him the other two were no longer there but had moved to the Lea County Inn. [Trial Tr. 226].  However, Regina Garcia, front desk clerk at the Lea County Inn, testified that immediately after Benavides rented Room 229 at the inn, she let several men into the room, including Cook. [Trial Tr. 125-28].

39.  As noted above, Cook has the burden of demonstrating that his defense was prejudiced by the omission of Benavides and Collins as witnesses.  "When an ineffective assistance claim centers on failure to investigate and elicit testimony from witnesses, the petitioner must 'demonstrate, with some precision, the content of the testimony they would have given at trial,'" Martinez v. Tafoya, 13 Fed. Appx. 873, 877 (10th Cir. 2001).  Cook failed to do this.  It is not enough to allege that another witness could have been called.  Cook was obligated to show how the proposed testimony would have altered the trial's outcome.  He has not explained how the testimony of these two people would have been helpful to the defense and has not indicated why the outcome of the trial would have been different if they had testified.  Further, his statement that employees of the motels should have been interviewed and might have provided some evidence helpful to the defense is vague and speculative.

40.  Cook also argues that his girlfriend could have testified that Cook "was planning on returning to California as soon as possible, and not to return to the hotel room in order to retrieve any drugs that had been hidden there by Mr. Adams." [Doc. 1, at 5].  The implication is that Cook

12

had nothing to do with the apparent attempt by someone, following his co-defendants' arrest, to return to the room at the Lea County Inn and retrieve the methamphetamine that Adams had stashed in the air conditioning unit.

41. Cook testified that, when he left the hospital, he caught a ride with a friend and went into hiding. His intention was to leave Hobbs immediately and get back to California, as he was worried about the small bag of marijuana which he'd admitted to the police was his, and there was a warrant out for him in Hobbs due to an old charge of driving without a license. [Trial Tr. 204-05]. As noted above, the decision whether to call a particular person as a witness is nearly always a matter for counsel to determine, based on the defense strategy. Even if Cook's girlfriend had testified and confirmed the statement that Cook planned to leave immediately for California, that would tend to establish only that Cook wanted to get out of Hobbs as soon as possible, not that he was uninvolved with the seized drugs or with the return visit to the hotel room.

42. It is undisputed that when the police arrived, Cook jumped out of the motel room's window. He was injured in the jump and couldn't walk on his own [Trial Tr. 45, 203-04]; thus, if he had been involved in any attempt to retrieve the drugs the next day, it is highly unlikely that he would have been able to go back to the room himself but rather would have had to get someone to do it for him. His stated intention to return to California immediately is not inconsistent with his making arrangements to have someone else return to the hotel room and retrieve the drugs. In any event, the jury could well have discounted any testimony from Cook's girlfriend, given her probable desire to keep the father of her child from going to prison. The Court finds that the lack of testimony from Cook's girlfriend does not demonstrate constitutionally defective conduct. Rather, it falls within the range of adequate trial strategy.

43. Cook contends also that Harris failed to obtain a clear set of photographs of the hotel

13

room, and the use of photocopies at trial meant that "exculpatory evidence regarding the evidence found in the motel room went undeveloped." [Doc. 1, at 5]. Cook does not state what information would have been discovered in clearer photographs and how that information would have been exculpatory. The photographs showed that a basketball jersey was hanging up in the window of the hotel room, a video game was in the room and on the TV screen, a small bag of marijuana was on the table, a separate (and much larger) amount of marijuana was inside a suitcase under the sink in the bathroom, and three separate suitcases containing clothing were also in the room at the time the three men jumped out the window. [Trial Tr. 30-38].

44. State Police Officer Nick Jimenez ("Jimenez") testified at trial that he entered the hotel room shortly after the three men jumped out. He noticed the basketball jersey hanging in the window and testified, based on his training and experience, that this is a signal that drug traffickers use to show they are open for business. [Trial Tr. 59]. Cook testified, however, that the T-shirt belonged to Gilkey, and that it was hanging near the window because Gilkey had just washed it and was letting it dry. [Trial Tr. 206-07]. Cook doesn't say what else might have shown up in a clearer photograph or how another photograph would have been exculpatory, nor has he established that a clearer photograph would somehow have turned the tide at trial.

45. Cook acknowledged that it was his video game, his suitcase containing his clothes, and his small bag of marijuana in the motel room. He said that he was not in the room that day to participate in a drug distribution scheme but rather to pick up his suitcase, "smoke a little weed and play a game" with his friends. [Trial Tr. 205-06]. He had an explanation for the presence of his items in the room that was consistent with innocence, and there is no reason to think that clearer photographs of those items would have made any difference. Cook does not indicate what else might have shown up in the photos that would have helped to exonerate him.

14

46.  In sum, the Court finds that counsel's pretrial investigation was not so inadequate as to demonstrate constitutional ineffectiveness and did not prejudice Cooks' defense.

B.
*Failure to File and Respond to Pretrial Motions*

47.  Cook next contends that Harris was ineffective in failing to file a motion to suppress the methamphetamine found in the hotel room on the second search conducted by Agent Wilson when he returned to the motel the day after Cook and his co-defendants jumped from the window.  Cook contends that this second search may have been conducted in violation of the Cook's Fourth Amendment rights and those of Benavides, in whose name the hotel room was rented.  Cook argues that Harris's failure to conduct adequate pretrial investigation meant that he was unaware throughout the trial that there was a factual basis for asserting standing and therefore for filing a motion to suppress.

48.  Cook further argues that Harris was ineffective in failing to file a response to the prosecution's May 23, 2005 notice of intent to introduce Cooks' prior felony convictions.

(a) Motion to Suppress

49.  In his affidavit, Harris states that "[i]t seems clear to me" that Cook had no standing to suppress the evidence since he had no proprietary interest in the methamphetamine and never spent the night in either of the hotel rooms where his co-defendants stayed but rather slept at his cousin's house, a contention the cousin, Martha Wright, confirmed in her testimony.  [Doc. 19, Ex. 1, at 1]. The Government argues that it was not ineffective assistance to fail to file a motion to suppress, because any such motion would have been denied based on Cook's lack of standing.

50.  Even if it were clear that Cook's personal rights were violated, he would not be entitled to habeas relief unless he could demonstrate the probable success of such a motion.

51. Fourth Amendment rights are personal and may not be vicariously asserted; thus, Cook had no standing to move for suppression based on an asserted violation of Erica Benavides's Fourth Amendment rights. Alderman v. United States, 394 U.S. 165, 174 (1969); Thomas v. United States, 394 F.2d 247, 249 (10th Cir. 1968). His standing to seek suppression based on a violation of his own right to be free from unconstitutional searches turns on whether he had a legitimate expectation of privacy in the premises searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). He claims no such interest. To the contrary, he contends that this was not his room and the drugs found therein were not his.

52. Cook's defense was grounded on ignorance of the presence of the methamphetamine and lack of any involvement in a drug distribution scheme. Cook testified at trial, and counsel emphasized in his closing argument, that Cook simply got a ride to Hobbs with Gilkey and Adams. Cook said that he did not rent the room himself; this is undisputed. He testified that, when the trio drove up to the Comfort Inn, he recognized Erica Benavides and that she rented the room for Gilkey and Adams. Others testified that Cook and Benavides made the arrangements for both rooms, and that the rooms were rented for the purpose of selling drugs. Cook disputes this, as his defense depended on distancing himself from Gilkey and Adams and minimizing his involvement with them.

53. Cook testified that he did not spend the night in the hotel room where the drugs were found, but rather spent both nights with his cousin. The cousin, Martha Wright, confirmed that testimony. Cook's suitcase and video game were found in the room at the time of the search, but Cook says he came to the motel room that day for the purpose of retrieving his suitcase and then stayed around and smoked marijuana and played video games with the other two.

54. Both Gilkey and Adams testified that Cook spent one night with them in a motel room, but they differ as to which night it was, and in which motel this occurred. Gilkey said that Cook

spent the night with him and Adams at the Comfort Inn the first night they were in Hobbs; he says
that Cook did not spend the night with them at the Lea County Inn the second night and instead
stayed with his family.  [Trial Tr. 96-97, 114-116].  Adams testified that Cook did not spend the
night with them at the Comfort Inn the first night and he thinks Cook stayed with a "lady friend" that
night; but he said further that Cook did spend the night at the Lea County Inn the second night,
sleeping on the floor. [Trial Tr. 266-67, 277-78].

55.  Harris pointed out in closing argument that a person would be unlikely to spend the night
in a motel room, sleeping on the floor, when he had a comfortable bed available at a relative's
house. [Trial Tr. 321-22].  He pointed to Cook's testimony that he basically hitched a ride to Hobbs
with Gilkey, who already had plans to go there, because he didn't have bus money and wanted to
visit his family.  He noted Cook's statement that Benavides happened to be at the registration desk
when the men secured the hotel room.  He emphasized the testimony which minimized Cook's
involvement with Gilkey and Adams and the motel rooms, and noted Cook's explanation as to why
his suitcase was in the room when he says he never stayed there. [Trial Tr. 321-322].

56.  In light of the defense theory that Cook was only marginally involved with Gilkey and
Adams for social purposes, that Cook had no idea Gilkey and Adams were in Hobbs in order to
distribute methamphetamine, and that he had little contact with the motel rooms, it would have been
inconsistent for him – indeed, it would countermand the entire thrust of his defense – to contend that
he had sufficient privacy interest in the room or in the items seized to provide standing for a motion
to suppress.  While any testimony he might have given at a suppression hearing could not be used
at trial on the issue of guilt, Simmons v. United States, 390 U.S. 377, 394 (1968), Cook has not
indicated what he could truthfully have said at the suppression hearing that would confer standing
on him, as his consistent position throughout the proceedings and his testimony at trial was to the

effect that he had little if anything to do with the motel rooms.  Nor has Cook indicated what other evidence and arguments could have been raised at the suppression hearing to establish standing.

57.  The Supreme Court has rejected the concept of "automatic standing" under which any defendant charged with a crime of possession would automatically have standing to seek suppression of narcotics or whatever other items the Government claims were possessed by the defendant.  United States v. Salvucci, 448 U.S. 83, 84-85 (1980).  And the fact that Cook may have been "legitimately on the premises" as an invited guest of the person who rented the room is not in itself sufficient to confer standing to file a motion to suppress; simply being there in the hotel room does not give him standing to contest a search.  Rakas v. Illinois, 439 U.S. 128, 148 (1978); United States v. Carr, 939 F.2d 1442, 1446 (10th Cir. 1991).

58.  Rather, the defendant must establish that he had a legitimate expectation of privacy in the area searched, an expectation which society is prepared to recognize as reasonable.  Katz v. United States, 389 U.S. 347 (1967); Rawlings v. Kentucky, *supra*; United States v. Conway, 73 F.3d 975, 979 (10th Cir. 1995).  Cook has not demonstrated how he could have established this, nor what his attorney overlooked that might have prompted him to file a motion to suppress.

59.  Cook did admit that his suitcase and clothing were found in the room, and the presence of a defendant's belongs in a motel room is relevant to the determination of a reasonable expectation of privacy.  United States v. Gordon, 168 F.3d 1222, 1227 (10th Cir. 1999).  However, in this case, Cook's explanation for the presence of the suitcase in the motel room on the day the search warrant was executed – *i.e.*, that he left it with Gilkey and Adams inadvertently and returned that day to retrieve it and take it away with him – is inconsistent with an expectation of privacy in the motel room.

60.  In addition, it appears that even if Cook had claimed a right to privacy in the motel

18

room, by the time of the second search he had abandoned that room and therefore abandoned any right to privacy therein. The evidence showed that all three men jumped out of the window of the room at the Lea County Inn on August 26, 2004, when the police entered the room on a search warrant. Cook testified that he did not return to the room thereafter but was in the hospital and hiding out during the four days between the initial search and his arrest.

61. Agent Hansen returned to the hotel on August 27, on a tip that someone was trying to gain access to the room, and he found the methamphetamine that day while conducting a second search. There is nothing in the record to indicate what time he performed this second search. Regina Garcia, the desk clerk at the Lea County Inn, said she rented the room to Erica Benavides on the August 25, and that the room was rented through the 27th. [Trial Tr. 129]. Thus, it appears that someone had planned to stay in the room during the day and night of the 27th. However, even if the rental period had not yet expired at the time of the second search, Cook would not have standing to suppress evidence found therein because he abandoned the room, and "it was defendant's own conduct that prevented his return to the motel." United States v. Croft, 429 F.2d 884, 887 (10th Cir. 1970).

62. In any event, Cook never asserted a right to privacy in the room but rather contended vigorously that he had very little to do with the room. Defense counsel chose a theory of the case which precluded his arguing the type of involvement which would form the basis for standing to file a motion to suppress. This was a strategic decision which does not constitute constitutionally ineffective assistance. Cook now argues that Harris failed to conduct sufficient research and was unaware of the basis for standing; however, Harris states that he considered and rejected the standing argument, and the defense theory adhered to at trial supports this contention and demonstrates that this was a matter of trial strategy.

19

63.  In addition, Cook has not shown prejudice, in that he does not state what grounds there would have been for seeking suppression and has presented nothing to indicate that a motion to suppress the methamphetamine evidence would have been successful.

64.  The Court finds that Harris's failure to file a suppression motion did not constitute ineffective assistance of counsel.

(b)  <u>Failure to file response to notice of intent to introduce prior convictions</u>

65.  On May 23, 2005, the Government filed a Notice of Intention to Introduce Defendant's Prior Felony Conviction Pursuant to Fed. R. Evid. 609 [CR Doc. 84], for the purpose of attacking Cook's credibility if he opted to testify at trial.  Trial began the next day.  Cook asserts that his attorney was constitutionally ineffective in failing to file a response to this notice.

66.  The document filed was not a motion in limine, to which a written response would be required.  It was, rather, a notice to defendant that the Government would introduce the prior conviction evidence, if Cook took the stand at trial.  Cook does not state what Harris would have included in a written response to the Notice which could have resulted in exclusion of the prior convictions.  There was no time for a fully briefed "motion" at that point, the day before trial was to begin.

67.  The fact that Harris did not file something in response to the Notice did not preclude the defense from arguing later, at a point when it was clear that the defendant would testify, that the evidence was inadmissible, as "any final determination as to admissibility under Rule 609(a)(1) rests on a balancing of the probative value and prejudicial effect of the conviction – a balancing that could only properly be performed after an assessment of the evidence that had come in up to the point of its admission."  <u>United States v. Mejia-Alarcon</u>, 995 F.2d 982, 987 n.2 (10th Cir. 1993).

68.  Cook did take the stand and, at the close of his testimony, the trial judge asked the

Government whether it intended to proceed with the prior conviction evidence.  The prosecutor indicated that the Government intended to introduce the evidence, and a discussion took place as to whether the evidence of two prior convictions should be admitted; thus, Defendant did not waive any rights by counsel's failure to file a response to the Notice.

69.  The trial judge ruled that a prior conviction for vehicle theft would be excluded, but he permitted the prosecution to raise the prior drug conviction in light of Cook's voluntary statement on the stand that he never sold drugs. [Trial Tr. 208-211].  Harris was permitted to conclude the direct examination by asking his client about the prior drug conviction, and questioning proceeded. The issue of whether counsel effectively prepared Cook to testify, and whether his handling of Cook's testimony was appropriate, is discussed in Section H. below.  The Court finds that Harris was not ineffective in failing to file a response to the Government's Notice.

C.
*Failure to Object to Prosecutor's Improper*
*Leading Questions and Improper Use of Evidence*

70.  Cook also faults his trial attorney for failing to object to improper leading questions by the prosecution, citing Trial Tr. 55-58.

71.  He further cites Harris's failure to object to the continued presence of certain evidence, consisting of large quantities of marijuana and methamphetamine, which remained in sight of the jury after it was introduced.

(a)  Failure to object to leading questions

72.  The Government contends that the questions cited by Cook were not leading.  Even if they were, the Government argues, counsel's decision not to object could well have been sound trial strategy; he may have wanted to avoid appearing as an obstructionist, or overly zealous, or he may have wanted the jury to hear the testimony.

21

73. Leading questions ordinarily are improper on direct examination, except as necessary to develop the witness's testimony. Fed. R. Evid. 611©. However, there may be times when an attorney has no reason to object to the use of leading questions on direct examination, and to do so would simply delay the proceedings while the questioner rephrases the question and elicits the same testimony. Simply because a technical objection is available does not mean it should be asserted.

74. In <u>Jamison v. Lewis</u>, No. 93-16084, 1994 WL 379230, at *2 (9th Cir. Jul. 20, 1994), the court noted:

> Although the trial court record shows that the prosecutor asked many leading and repetitive questions when he examined the victims, Jamison fails to show that the testimony would have been inadmissible if elicited through non-leading questions or that subsequent repetitive questions would have added to the jurors' knowledge. Thus, had Jamison's counsel objected to the manner in which the prosecutor elicited questions from the victims, the prosecutor would have simply rephrased the questions.

75. The same is true in the present case with respect to questions put to the police witness. Cook cites leading questions at pp. 55-58 of the trial transcript. The witness was State Police Officer Nick Jimenez ("Jimenez"). Jimenez was the second witness to testify in the prosecution's case. Preceding him was Michael Wilson ("Wilson"), narcotics agent with the New Mexico State Police. Wilson testified about events surrounding execution of the search warrant at a room in the Lea County Inn on the afternoon of August 26, 2004. [Trial Tr. 20-39]. Jimenez was present when the search warrant was executed, and his testimony was in line with Wilson's. At pp. 55-58, the prosecutor questioned Jimenez about the events of that day. Some of the questions asked could perhaps be characterized as leading; for example:

> When Jimenez testified that he was second in line among the agents who entered the motel room that day, the prosecutor asked, "In fact, you had the key to the room; is that correct?" Jimenez answered, "Yes. I was able to get a key from management to enter into – into

the room." [Trial Tr. 55].

Another possibly leading question was: "Prior to entering the room, did you knock and announce your presence?" The answer was, "Yes. We knocked and announced and advised or said, 'Police. Search warrant.'" [Id.].

When Jimenez testified that he saw Cook climb out the second-story window and run off into an open field then finally collapse in the pasture, the prosecutor asked "Was anybody chasing him?" Jimenez responded, "Yes. At that time a couple of officers were chasing him." [Trial Tr. 57]. The next question was, "And did they catch Mr. Cook?" Answer: "Yes." Question: "All right. And they arrested him or at least took him into custody at that time?" Answer: "Yes, sir." [Trial Tr. 58].

The prosecutor stated that Officer Wilson chased Cook's co-defendant Gilkey, "is that correct?" Answer: "Yes." Question: "So you were the only one in the room at that time?" Answer: "Yes, sir." Question: "Were you charged with the responsibility of collecting evidence?" Answer: "Yes. I was given that task, yes." [Id.].

76. While these questions are arguably leading in that they suggest the answer, a reasonable defense attorney could choose not to object. The testimony given was basically the witness's eyewitness account of what occurred on the day the search warrant was executed. The evidence was relevant, and there was no objection that could have kept it out aside from the fact that the prosecution led the witness to some extent. If Harris had objected, the prosecutor could easily have rephrased the questions and the testimony would have come in anyway, and defense counsel would have run the risk of appearing to keep the jury from hearing relevant evidence.

> Failure to object at trial to leading questions is generally considered a tactical decision . . . . Petitioner has failed to show that any of K.C.'s testimony would have been inadmissible if elicited through rephrased non-leading questions that the prosecutor would have asked had his counsel objected and the objection been sustained. Thus, there is no evidence that the result of the proceedings would have been any different if petitioner's counsel had repeatedly objected to the prosecutor's leading questions . . . . There is certainly no evidence that such a tactic would have resulted in significantly

different trial testimony.

Reynolds v. Rawer, No. CIV S-04-1050, 2008 WL 707333, at *12 (E.D. Cal, Mar. 14, 2008).

77.   The trial court has broad discretion under Rule 611© to permit leading questions over the objection of opposing counsel.  United States v. Olivo, 69 F.3d 1057, 1065 (10th Cir. 1995); Shultz v. Rice, 809 F.2d 643, 655 (10th Cir. 1986) (court has discretion to allow leading questions "during direct examination to develop testimony and expedite entry into evidence of time-consuming foundational information").  As noted, Jimenez's testimony was a relatively straightforward account of what he saw and did during execution of the search warrant.  It is probable that the Court would either have overruled an objection if one had been raised, for reasons of "avoid[ing] needless consumption of time," Fed. R. Evid. 611(a), or asked the prosecutor to rephrase the questions.  And defense counsel could well have decided that a continuous series of objections might alienate the jury.  Thus, it was a reasonable choice to conclude that the potential downside of continually objecting to these questions, in this context, outweighed any possible benefit.

78.   There is no ground for finding ineffective assistance in Harris's failure to object to leading questions during the direct testimony of Officer Jimenez.

(b)   Failure to object to continued presence of drug evidence

79.  Cook further faults his attorney for failing to request that the drug evidence be removed from the sight of the jury once it was entered into evidence.  He states that "large quantities" of both marijuana and methamphetamine remained in view of the jury and implies that this was prejudicial to his case.

80.   It could be a good defense practice to ask that large amounts of drug evidence be removed from the courtroom after its introduction, as real evidence "has an aura of objective reality

24

that is difficult to dispel and thus can have a powerful impact on the finder of fact."  Criminal Practice Manual § 63:1.  On the other hand, counsel might well decide that it would call unnecessary attention to the evidence to ask that it be removed, particularly if the prosecution objected and the Court denied the request.  And counsel could reasonably make a decision not to demand removal of the large quantities of drug evidence, given the defense theory that regardless of the drug quantities, Cook had nothing to do with the illegal drug activity conducted by his co-defendants. Indeed, a prudent defense attorney advancing the claim that all of the drugs belonged to Gilkey and Adams may well have wanted the jury to be reminded that Gilkey and Adams were long-time criminals, and the very presence of the drugs might cast doubt on the stories being presented by Gilkey and Adams. Thus, the failure to object may well have been part of trial strategy.

81.  While the Court can speculate as to potentially prejudicial effects of the continued presence of the drug evidence, it declines to do so.  Even when a jury is exposed to evidence that has not been formally admitted, the defendant must show that "there was some prejudice or substantial right affected by the presence" of the item, United States v. Magana, 118 F.3d 1173, 1183 (7th Cir. 1997), and Cook has not made that case here.

82.  The Court finds no constitutionally ineffective conduct on the part of Harris with respect to any continued presence of drug evidence in the courtroom.

D.
*Failure to Adequately Cross-Examine*
*Cook's Co-Defendants*

83.  Cook contends that in cross examining co-defendant Adams, Harris failed to bring out discrepancies between Adams's testimony on the stand and his earlier statements to police,  and failed as well to emphasize the extent to which Adams blamed Cook and co-defendant Gilkey for the crimes while absolving himself at their expense.  He cites pages 280-81 of the transcript

Adams's testimony at trial and attaches the police report to his petition.

84. The police report states that Adams told police that Gilkey was a friend of Cook's and that Cook convinced Gilkey that they could make more money selling the methamphetamine in Hobbs than in California. Adams also told police that Benavides rented the room at the Lea County Inn so that Gilkey, Cook and Adams could sell drugs there, and that she earlier rented them a room at the Comfort Inn where she worked. Adams also told police that Benavides was dating Collins, that the Benavides and Collins helped set up some of the methamphetamine transactions, and that the methamphetamine belonged to Cook. [Doc. 1, Ex. C].

85. At trial, on direct examination by the prosecution, Adams testified that it was Cook who initially brought up the idea to go to Hobbs, since Cook knew people there and they could make more money. He said that Cook was the one who was going to set up all the transactions in Hobbs. The selling would be done through Collins and other people that Cook knew in Hobbs. Adams further testified that Benavides and her boyfriend Collins rented the room at the Comfort Inn for the first night, then later helped them get another hotel room at the Lea County Inn. He said that Cook was present when those arrangements were being made and that Cook spent one night with them in the motel room. Adams also testified that, after they were all arrested, Cook advised Adams that he was going to send some people back to the motel room to try to retrieve the methamphetamine, so that he could sell it and bail out Adams and Gilkey. [Trial Tr. 256-70].

86. Adams's trial testimony was not markedly different from the statements recorded in the police report. Cook may be referring to the fact that Adams didn't tell the police, or anyone else, that Cook said he was sending some people back to the hotel room to retrieve the methamphetamine, and that this information was provided for the first time when Adams took the stand at trial. Harris cross-examined Adams closely about the fact that he didn't mention this information to the police

earlier and in fact never told this to anyone until the morning of his testimony, when he divulged it

to the prosecutor. [Trial Tr. 282-83]. The point of the questioning was to imply that the story was

made up on the spot, and Harris's cross-examination made this clear.

87. Cook also contends that Harris "failed to make clear the extent to which Mr. Adams had

lied in blaming either Mr. Gilkey or Mr. Cook for every criminal act at some point, while absolving

himself at their expense." [Doc. 1, at 6]. In his testimony, Adams admitted that he and Gilkey

obtained the drugs by robbing a man in California. He said that Cook was the one who suggested

going to Hobbs, and that Cook was going to make all of the arrangements for distribution there.

Adams acknowledged that he had an interest in the methamphetamine and said he was the one who

put it in the air conditioning unit. [Trial Tr. 256-69].

88. On cross-examination, Harris got Adams to admit that he lied to police upon his arrest,

when he told them he was not the owner of the methamphetamine and that instead it belonged to

Cook. [Trial Tr. 278-80]. Harris also got Adams to admit that he and Gilkey obtained the

methamphetamine by pulling guns on the man who had it, and that he had more than a passing

interest in the methamphetamine. [Trial Tr. 281]. It is apparent that Harris was attempting to show

the jury that Adams was not entirely truthful in his initial efforts to throw most of the blame on

Cook. While the cross-examination could perhaps have been done more smoothly or elegantly, that

is not the test of ineffectiveness.

89. Cook further contends that Harris failed to do a thorough cross examination of either of

the co-defendants with respect to the full benefit each was to receive in exchange for his testimony

against Cook. He argues that Harris should have questioned them about the mandatory five-year

penalty Adams faced for possession of a firearm in the furtherance of a drug crime.

90. Harris cross-examined Gilkey about the possible sentences he faced. He brought out

that, because his prior drug conviction, Gilkey would be facing a mandatory minimum sentence of 20 years, and that Gilkey was aware of this because his attorney advised him of it. Harris got Gilkey to admit that he could obtain no sentencing advantage by testifying against Adams or Rogers, because they pled guilty and would not be going to trial, and the only person left to testify against was Cook. [Trial Tr. 110-12]. Harris also asked Gilkey about the five-year enhancement he could have received for possession of a gun. Gilkey denied knowing about this but the issue was raised to the jury, and Harris elicited the acknowledgment that no gun charges were brought against Gilkey. [Trial Tr. 123]. Again, while this cross examination might have been more pointed, it did not constitute ineffective assistance.

91. On direct examination, Adams testified about his plea agreement. The prosecutor brought out that Adams did not face a weapons charge. She asked, "And as part of this plea agreement, was there ever an agreement that, you know, there wouldn't be any charges about a gun charge?" Adams replied, "Well the gun was never like brought. As far as charges assigned, the gun was never involved." [Trial Tr. 271].

92. It is unclear whether this testimony tends to prove that a gun charge was contemplated but was dropped when Adams agreed to testify against Cook, or whether it demonstrates that such a charge was never contemplated. The jury could have considered it either way. If indeed a gun charge was dropped in exchange for Adams's testimony, it might have been helpful for Harris to point this out on cross examination. The fact that he didn't, however, does not establish ineffective assistance. Harris had already questioned Gilkey about the sentencing benefit he would receive for pleading guilty and testifying against Cook, and the jury would assume that Adams was in the same situation. While Harris could perhaps have been more thorough in his cross examination of Adams and made more of an effort to emphasize the full extent of the benefit Adams would likely receive

for testifying against Cook, his performance was adequate.   "A defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." <u>Brown v. United States</u>, 411 U.S. 223, 231-32 (1973) (internal punctuation omitted).

93.   The Government argues that Harris effectively impeached co-defendant Adams about Cook spending the night at the hotel with them [Trial Tr. 277-78], and about conversations between Adams and Cook relating to retrieving the drugs from the hotel. [Trial Tr. 282-84].   The Government further notes that Harris's cross examination of Gilkey brought out the possible reduction in his sentence based on cooperation [Trial Tr. 110-13], and got him to corroborate some of Cook's testimony [Trial Tr. 116].

94.  The Court agrees and finds that Harris's cross examination of Cook's co-defendants was well within the range of proper representation.

E.
*Failure to Object to Improper Expert Testimony*

95.   Cook alleges that Harris failed to object or file a <u>Daubert</u> motion when Special Agent Eric Hansen ("Hansen") was allowed to testify as to his general knowledge of drug purity and price, without first being proffered as an expert witness.  [Trial Tr. 155].

96.   The Government asserts that Hansen was in fact offered as an expert witness, and that notice was given on May 19, 2005.  Furthermore, the Government contends, there was no reason to object to the expert testimony in light of Cook's defense, which did not turn on the issue of whether the amount of drugs was sufficient to establish the distribution portion of the charge, but rather focused on his non-involvement in any distribution scheme and lack of knowledge of the methamphetamine.  Given this defense, the Government argues that it was within sound trial strategy to forgo objection to Hansen's testimony, since such objection would tend to emphasize the

testimony.

97.  The Government did file a Notice of Expert Witness Testimony [Doc. 83 in CR 04-2395] on May 19, 2005.  The notice set forth the experience and qualifications of Special Agent Hansen of the Drug Enforcement Administration and notified defendant that Hansen would testify that the quantity of marijuana and methamphetamine involved in this case is a distributable amount as opposed to a personal use amount and would also testify as to the monetary value of the drugs and would give an overview of the business aspects of a narcotics smuggling scheme, describing the duties of different individuals involved in such a scheme.

98.  Harris would have had no reason to object to Hansen's testimony on grounds he was not proffered as an expert witness because Hansen was so proffered; the defense therefore had notice that the Government would call him to testify as an expert in illegal drug activity.  His testimony at trial was not a surprise and, as the Government notes, any objection at the time of the testimony would have called attention to and emphasized the testimony.

99.  In addition, Hansen's credentials as an expert and his prior experience testifying in federal court were set forth in the Notice of Expert Witness Testimony, and Cook has not shown that a <u>Daubert</u> challenge would have been successful.

> [W]e have allowed law enforcement agents to give expert testimony on the drug trade under Rule 702 of the Federal Rules of Evidence, because it is likely to assist the trier of fact to understand an otherwise unfamiliar enterprise.  See, e.g., <u>United States v. Quintana</u>, 70 F.3d 1167, 1170-71 (10th Cir. 1995) (meaning of the drug code); <u>United States v. Muldrow</u>, 19 F.3d 1332, 1338 (10th Cir. 1994) (significance of the quantity of cocaine); <u>United States v. Sturmoski</u>, 971 F.2d 452, 459 (10th Cir. 1992) (equipment of the drug trade); <u>United States v. Harris</u>, 903 F.2d 770, 775-76 (10th Cir. 1990) (drug records).

<u>United States v. Wilson</u>, 276 Fed. Appx. 859, 861 (10th Cir. 2008).

100.  In addition to serving as an expert witness on illegal drug activity, Hansen also served as the federal case agent assisting with the investigation of Cook's case. [Trial Tr. at 153].  The Tenth Circuit notes the potential for prejudice when a case agent also testifies as a drug expert; however, the court has declined to establish a *per se* rule prohibiting the use of case agents as experts, instead relying on the discretion of the District Court.  United States v. Mendoza, 236 Fed. Appx. 371, 384 (10th Cir. 2007).  While Harris might have interposed an objection to Hansen's testimony, he could well have decided that such an objection would have been futile and that, in any event, exclusion of Hansen's expert testimony was not critical to the defense, which focused on Cook's lack of knowledge or participation in the co-defendants' drug distribution activity, rather than on whether the amount of drugs involved was indicative of a scheme to distribute.

101.  The Court finds that Defense counsel's actions with respect to the expert testimony of Special Agent Hansen did not rise to the level constitutionally ineffective assistance.

F.
*Failure to Object to Prosecutor's*
*Improper Closing Argument*

102.  Cook asserts that his attorney was ineffective in not objecting when the prosecutor made reference in her closing argument to Cook's failure to turn himself in and make a statement to police immediately following the arrest of his co-defendants.  The prosecutor's statement, Cook contends, violated his Fifth Amendment rights.  [Trial Tr. 339].

103.  The Government disputes Cook's assertion that the prosecutor's statement constituted a comment on Cook's right to remain silent, contending rather that the statements made in closing were simply a response to a theory raised by the defense and were meant as an attack on Cook's credibility.

104.  Cook was not immediately arrested, as his two co-defendants were, even though he was

seen jumping out the window and was stopped by police.  His heel or ankle injuries were sufficiently serious that an ambulance was called and he was taken to the hospital, instead of to the police station as his co-defendants were.  He seems to have slipped away from the hospital, unnoticed by the police, and was not arrested until several days later when he was discovered hiding under a pile of clothing in the closet of a private home.

105.  In her closing argument the prosecutor said, "In thinking about the credibility of all of this, you do have to think about the defendant's story and his credibility." [Trial Tr. 338].  She went on to attempt to discredit much of what Cook said in his testimony.  For example, she pointed out that Cook said the reason there was a rolled-up towel under the door was not to hide the smell of methamphetamine, which Cook claimed he didn't know was there, but because he was smoking marijuana in the room at the time the police arrived; however, the police said they didn't smell any marijuana nor did they find any evidence that marijuana had recently been smoked in the room.

106.  The prosecutor further challenged the credibility of Cook's testimony that he jumped out of the motel window when the police arrived, not because he knew there was methamphetamine in the room, but rather due to his awareness that he was breaking the law by possession of the small amount of marijuana.  She asked the jury to consider, then, why Cook didn't go to the police at some point during the four-day period when he was hiding out before he was arrested, and admit to the small amount of marijuana and offer to testify against Adams and Gilkey.  She continued, "Why is it that it's not until he is arrested under piles of clothes?  It's because, when he jumped, he knew there was methamphetamine there."  [Trial Tr. 338-39].

107.  Cook argues that the prosecutor's reference to Cook's failure to turn himself in and admit to the small amount of marijuana constitutes a comment on his right to remain silent.  He asserts that his attorney was ineffective in failing to object at that point.

32

108.   The silence which prompted the prosecutor's comment occurred during the few days after Cook jumped from the window and before he was arrested.   He did not "invoke" his right to silence, or sit silently when being questioned; rather, he simply failed to step up, turn himself in, and admit to the marijuana possession.

109.   Cook's entire defense was built around the contention that he was merely along for the ride from California to Hobbs with Adams and Gilkey.   He claims that although he purchased a small amount of marijuana from them, "smoked a little weed" in the hotel room and was aware that they had in their possession a much larger amount of marijuana, he was not part of their drug-trafficking scheme and had no idea that they had methamphetamine in the room and planned to distribute it.   He testified accordingly at trial.   The prosecution, in its closing argument, cited Cook's pre-arrest failure to turn himself in and admit to the minor marijuana possession as evidence that he was aware of the more serious charge that faced him; the prosecutor asked the jury to infer that Cook would surely have turned himself if he were guilty of nothing more than possession of a small amount of marijuana.

110.   In the Tenth Circuit, a prosecutor may not comment on a defendant's pre-arrest silence. However, even in this circuit, "[i]t is well-established that a prosecutor may use a defendant's pre-arrest silence to impeach the defendant's credibility."   United States v. Chimal, 976 F.2d 608, 611 (10th Cir. 1992).   The Chimal case involved a defendant who failed, during an internal tribal investigation, to offer a relatively innocent explanation for her conduct.   Defendant argued that this failure constituted an exercise of her Fifth Amendment right to remain silent.   While the trial court would not allow the prosecutor to question witnesses about defendant's silence during the internal investigation, the court permitted such questioning on cross examination when the defendant testified.

111.  The <u>Chimal</u> court cited <u>Jenkins v. Anderson</u>, 447 U.S. 231 (1980), a case similar to Cook's.  In that case the defendant, who turned himself in to authorities two weeks after a fatal stabbing, took the stand at his trial and testified that he acted in self-defense.  The Supreme Court held that it was permissible for the prosecution to ask the defendant on cross examination why he didn't wait for police to arrive after the stabbing so that he could provide this explanation, and why he waited two weeks after the alleged self-defense stabbing to come to the police and report it.  "The Supreme Court found no error, holding that the use of pre-arrest silence to impeach a defendant's credibility did not violate the Constitution because the 'impeachment follows the defendant's own decision to cast aside his cloak of silence.'" <u>Chimal</u>, at 612, *quoting from* <u>Jenkins</u>, at 238.

112.  Cook testified in this case and presented the defense outlined above.  The prosecution was entitled to challenge the credibility of his version of events.  In these circumstances, it was not a violation of Cook's Fifth Amendment for the prosecution to raise a question as to why Cook did not come forward earlier, prior to his arrest, and admit to the lesser marijuana possession charge, and his attorney was not ineffective in failing to object when the prosecutor did so.

G.
*Failure to Give an Opening Statement for the Defense*

113.  Cook cites counsel's decision to forgo giving an opening statement as further evidence of his  ineffectiveness.

114.  In his affidavit Harris said, "I have tried numerous cases with good results by not giving opening statement which tends to tip off the prosecution of what the defense is going to be.  I have been really successful using this tactic in court." [Doc. 19, Ex. 1, at 1].  Cook responds that if Harris's goal was to prevent exposure of his defense theory, he could have given an opening statement after the Government rested and prior to presentation of the defense.

115.  Defense counsel is not obligated to give an opening statement, and a decision to forgo opening statement is nearly always seen as a matter of strategy.  In this case, defense counsel notes that the failure to give an opening was intentional, thus, strategic.

> While counsel has the option of opening at a trial, and an opening may be deemed helpful, Miller [the defendant] has not made us aware of any authority that requires that an opening be made. Here, Calder [defense counsel], while he could have referred in an opening to evidence that he intended to produce, did produce such evidence at trial – through witnesses.  Most importantly, Calder argued on Miller's behalf in summation on the basis of the evidence taken at trial. We do not condone foregoing [sic] any rights or options available to a defendant, but we cannot say that a strategic decision to eschew an opening constitutes – without more – ineffective assistance of counsel.

United States v. Miller, 907 F.2d 994, 1000 (10th Cir.1990).

116.  *See also*, United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) (counsel's decision to forgo opening statement was reasonable because he could not be sure, in spite of adequate pretrial preparation, what his client would decide to say if he took the stand);  Nguyen v. Reynolds, 131 F.3d 1340, 1350 (10th Cir. 1997) ("Defense counsel's failure to make an opening statement was nothing more than a tactical decision that did not adversely affect Nguyen"); Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000) ("it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel"); United States v. Larsen, 175 Fed. Appx. 236, 240 (10th Cir. 2006) ("An opening statement is optional . . . and there is a strong presumption that trial counsel in deciding to waive it was using sound trial strategy . . . .  Indeed, we have consistently held that without more, waiver of an opening statement does not constitute ineffective assistance of counsel, even when no reasonable explanation exists for counsel's decision to waive opening statement").

117.  Harris says that the lack an opening statement for the defense was a trial tactic which

he often used and which had been successful for him in the past.  At the beginning of trial, he reserved the right to make an opening statement later [Trial Tr. 19].  When it was time for the defense to present its case, the Court asked Harris, out of the presence of the jury, whether he wished to make an opening statement.  Harris responded, "No, Your Honor.  I gave those up two or three years ago.  They didn't seem to help me." [Trial Tr. 174].  If, in his experience, he felt that opening statements were not helpful, then it would be sound trial strategy for Harris to forgo an opening statement in this case.

118.  Cook does not point to anything in particular that Harris could have said in opening, either before or after the prosecution's case, that might have resulted in an acquittal.  The Court cannot speculate on this, and finds that Cook has not met his burden of establishing the prejudice prong with respect to this assertion of error.

H.
*Failure to Prepare Defendant for His Trial Testimony*

119.  Cook claims that although his attorney was aware that the Government intended to introduce Cook's previous drug offense at trial, counsel failed to prepare Cook for this evidence. He contends that the trial transcript shows he was confused by simple questions asked by his own attorney, even questions about his prior convictions, because he was not prepared to answer them; thus, he argues, Harris impeached his own client.  Harris disputes the allegation that he failed to prepare Cook for his testimony at trial and says he believes Cook's testimony was excellent. [Doc. 19, Ex. 1, at 1].

120.  On the eve of trial, the prosecution filed a Notice of Intention to Introduce Defendant's Prior Felony Conviction [Doc. 84 in CR 04-2395] for the purpose of attacking Cook's credibility, if he testified.  The notice, filed pursuant to Fed. R. Crim. P. 609, stated that the prior offenses the

prosecution intended to introduce included a conviction in January 1998 for possession of a controlled substance in San Bernardino County, California, which resulted in a sentence of 36 months' probation; and a separate California conviction in August 1998 for vehicle theft, for which Cook was placed on probation.

121. Cook took the stand. At the end of direct examination, Harris asked Cook whether he introduced Gilkey and Adams to any people in Hobbs who wanted to buy drugs. Cook answered, "No, sir. I don't sell drugs. I never have sold drugs." [Trial Tr. 208]. The prosecutor objected on grounds the answer was not responsive to the question asked; the objection was sustained. At this point, Harris said, "That is all, Your Honor."

122. The trial judge then called counsel to the bench and asked the prosecutor whether she intended to raise the prior convictions on cross examination; she answered yes. The judge would not allow the theft conviction to come in but ruled that the drug conviction could be raised, based on Cook's voluntary statement that he never sold drugs. The judge then gave Harris the opportunity to return to direct examination and question Cook about the drug conviction. [Trial Tr. 208-211].

123. Harris questioned Cook about the marijuana possession charge he faced "sometime back." Cook said that he was charged with possession of marijuana, that the amount he possessed was approximately $10 to $20 worth, and that he pled guilty to the charge. Asked what his punishment was, Cook answered, "Drug rehab," for 60 days. [Trial Tr. 211-212]. On cross-examination, the prosecution brought out that, in addition to the rehab, Cook was also placed on probation for 36 months, and that the possession charge was a felony. [Trial Tr. 211-214].

124. Cook now argues that his attorney did not prepare him adequately for his testimony, and that counsel was forced to impeach his own client. The problem, however, was not lack of preparation, but lack of candor. Had defendant not misrepresented this prior drug sentence, it would

37

not have been necessary to correct the testimony.  It would arguably have been better practice for counsel to ensure that Cook told the jury all of the details about the prior conviction and sentence. On direct examination, Cook did not mention the 36 months of probation, nor did he state that the offense to which he pled guilty was a felony.  Defense counsel are generally advised to ensure that, if their clients take the stand, they admit to any prior convictions that the prosecution intends to produce, and testify honestly about the circumstances of the earlier case or cases as "a way of drawing the sting from any impeachment of [defendant] with those crimes when he testified." Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir. 1998); United States v. Bad Cob, 560 F.2d 877, 883 (8th Cir. 1977).

125.  Here, Harris could have done a better job of bringing out all details of the sentence, including the probation term and the fact that the charge was a felony, in order to take the "sting" out of the prior conviction evidence which the prosecution stated it would present on cross examination, and which the Court ruled was admissible.  The direct examination was perhaps done less thoroughly than it could have been, and the jury may have been left with the impression that Cook was trying to minimize the seriousness of the prior offense, and that he tended to be less than truthful about his involvement with drugs.

126.  However, the Court cannot say that the result of the trial would have been different if the information brought out on direct had been more complete.  Cook didn't lie on direct examination about his sentence or about the nature of the offense; rather, he omitted the fact that he served a probationary period in addition to the drug rehab, and he did not offer the information whether the crime was a felony or a misdemeanor.

127.  Cook must establish that he was prejudiced by counsel's failure to prepare him to testify, Smith v. Gibson, 197 F.3d 454, 462  (10th Cir. 1999).  In these circumstances, prejudice has

not been established.  "[D]efendant will not prevail on ineffective assistance of counsel claim merely by alleging that counsel failed to prepare defendant to testify; defendant must also show prejudice . . . .  The test is not whether the defendant was fully satisfied with defense counsel."  <u>United States v. Mealy</u>, 851 F.2d 890, 909 (7th Cir. 1988), *cited in* <u>Smith v. Gibson</u>, *supra.*  In sum, while counsel could have handled more skillfully the direct examination on the topic of prior offenses, Cook has not established the prejudice prong with respect to this claim of ineffective assistance.

I.
*Failure to Object to Improper Rebuttal Witness*

128.  Cook argues that his co-defendant Adams was called as a rebuttal witness at the close of defendant's case, with no objection by Harris when Adams failed to present any new testimony to serve as rebuttal to Cook's case; rather, Cook contends, Adams's "rebuttal" testimony consisted solely of a reiteration of Cook's guilt.

129.  Cook testified in the defense case that he had no idea his co-defendants were in Hobbs for the purposes of trafficking drugs.  He said that he did not introduce Adams and Gilkey to people who wanted to buy drugs, and that he does not sell drugs and never has. [Trial Tr. 207-08].

130.  At the close of the defense case, the prosecutor informed the Court that she wanted to call Adams as a rebuttal witness.  She stated that they didn't call Adams earlier because his attorney was in trial on another case and wasn't available earlier. [Trial Tr. 228-229].  Cook now argues that although Adams would have been appropriate as a witness in the prosecution's main case, he should not have been permitted to testify as a rebuttal witness, as his testimony was merely a reiteration of Cook's supposed guilt rather than a rebuttal of Cook's testimony.

131.  As a rebuttal witness, Adams testified that he went to Hobbs, on Cook's suggestion, for the purpose of distributing drugs.  He said further that the three of them – Cook, Gilkey and

Adams – traveled together in one car while another man, Buddy Rogers, drove separately and was carrying the drugs.  Adams said they knew Rogers was nearby and chatted with him while on the road.  He said further that Cook knew people in Hobbs, and he was going to set up the drug transactions and do the selling.  He testified further that when they arrived in Hobbs, Cook introduced them to Collins and Benavides, and that Benavides rented the hotel rooms for them.  Adams said that Cook was present when both hotel rooms were rented, and that he took part in those arrangements.  He also said that Cook spent the second night in the hotel room with Adams and Gilkey.  [Trial Tr. 256-267, 277-78].

132.  All of this testimony rebuts what Cook said on the stand.  Cook said he went to Hobbs to see his pregnant girlfriend, that he simply rode along with Gilkey and Adams from California, that he didn't know that Rogers was traveling nearby until very late in the trip, that he didn't set up any transactions in Hobbs, that he was not present when the second room was rented, and that he did not spend either night at the motel rooms.  While the prosecution could have called Adams to testify in its case-in-chief, that does not preclude the Government from presenting Adams in rebuttal, if his testimony contradicts what Cook said on the stand.  "Generally, where the evidence rebuts new evidence or theories proffered in the defendant's case-in-chief, that the evidence may have been offered in the plaintiff's case-in-chief does not preclude its admission in rebuttal."  Bell v. AT & T, 946 F.2d 1507, 1512 (10th Cir. 1991).

133.  The trial court has broad discretion to admit or exclude rebuttal evidence.  United States v. Olivo, 80 F.3d 1466, 1470 (10th Cir. 1996).  There is no indication that, even if Harris had objected to the rebuttal testimony, the Court would granted such a motion.  As Adams's testimony went forward, it is apparent that it directly contradicted much of what Cook said in his testimony.  Cook claims that Adams merely reiterated his supposed guilt, but the trial transcript demonstrates

that this assertion is incorrect.  Thus, Harris's failure to make an objection regarding inappropriate rebuttal evidence did not constitute ineffective assistance.

J.

*Failure to Provide an Adequate Closing Statement*

134.  Cook next contends that Harris made several errors and misstatements in his closing argument, *i.e.*, he used co-defendant Adams's name at one point when referring to Cook; he misstated discrepancies in the co-defendants' stories;  and he said that Cook was the owner of "the marijuana," without clarifying that he was referring to the small bag of marijuana rather than the large amount of marijuana claimed by the prosecution.

135.  Harris says in his affidavit that he clearly argued that Cook "only claimed interest of a small amount of marijuana and not the methamphetamine." [Doc. 19, Ex. 1, at 1].  The Government takes the position that Harris's closing argument was a matter of trial tactics and represented objectively reasonable strategic decisions of counsel.

136.  Harris began his closing by pointing out to the jury that the case was largely one of credibility: Cook's version of events vs. the testimony of Gilkey, Adams and Rogers.  Harris spent most of the argument emphasizing that Cook's version of events made more sense than the others'.  He stated at one point, "That's what Mr. Cook – I mean Mr. Adams kind of indicated.  We were all equal.  We were all in it owning it together.  Well, that's not true, and it doesn't make sense." [Trial Tr. 319].

137.  Harris misspoke when he said "Cook" when he meant "Adams"; however, he corrected himself immediately and there is no basis for asserting that this misstatement caused the jury to convict when they would otherwise have acquitted.  Harris switched or forgot names more than once during the trial.  During his cross examination of Hansen, Harris wanted to refer to Rogers but forgot

his name; the judge had to tell him. [Trial Tr. 164].  A few moments later, Harris asked witness

Hansen whether Rogers said something "to Agent Hansen when he was initially debriefed"; the

judge had to remind Harris that the witness *was* Agent Hansen. [Id.].  Again, a few moments later,

Harris momentarily forgot Gilkey's name; again the judge provided the name and Harris responded

in a self-deprecating way, "Great on names, Judge."  [Trial Tr. 166-67].

138.  This type of forgetfulness or "misspeaking" is part of our human experience.  In the

context of the arguments and evidence, there is no likelihood that the jury would have been confused

by this instance of Harris's propensity to forget or switch names.  The Court cannot say that the

instance where Harris said "Cook" instead of "Adams" in his closing argument turned the course

of the trial.

139.  Cook also argues that Harris was ineffective in stating in closing argument that Cook

was "the owner of the marijuana, leaving open whether he is referring to the large amount of

marijuana the prosecution is claiming belonged to Petitioner, or referring to the small bag of

marijuana that the Petitioner actually claimed." [Doc. 1, at 7].  Cook cites the trial transcript at p.

328.  Cook's argument simply grasps straws.  It is apparent from the transcript that, in fact, Harris

made clear that Cook admitted only to owning the small amount of marijuana that he purchased

from Gilkey.  Harris said:

> There is a pile of marijuana on the floor.  If you read the instructions,
> he has to have – that doesn't mean he is the owner; he just happens
> to be in the room.  He is the owner, and he told you, "I'm the owner"
> – and told the police officers when they arrested him, "I'm guilty of
> the pot that's on the table in a little baggie.  I bought that."

[Trial Tr. 328].

140.  At other points in his closing statement, Harris again made the distinction:

> You subtract those two people, what do you have?  You have a man

who admits he purchased marijuana from Mr. Gilkey.  He bought it.
He got it in a little package and said it was $10 worth." [Trial Tr.
327].

He admitted to you, "My plan was not to come back.  I was just
going to go home to California and hope that they don't bother with
me since I'm only responsible for a small amount of pot, and maybe
they won't bother with me." [Trial Tr. 329].

141.  The Court finds that Harris was not ineffective with respect to his mention in closing

of Cook's ownership of marijuana.

142.  Cook also says that Harris mis-stated discrepancies in the testimony of the co-

defendants.  He does not give any examples but cites to the trial transcript at p. 321.  That page of

the transcript indicates that Harris said to the jury that Rogers testified differently from all the other

witnesses with respect to the sequence of events occurring after the group arrived in Hobbs.  Harris

noted that Rogers testified that they stopped at a store to transfer the drugs from Rogers's car to

Gilkey's, but that the transfer didn't occur there and Gilkey took off and drove around Hobbs and

out to a rural area where they parked outside a trailer.  Harris also noted that this testimony by

Rogers seems to have come out of the blue and that "[n]obody else agrees with that."  Harris further

noted that Cook testified he stayed with his cousin, whereas Adams and Gilkey testified that Cook

spent one night sleeping on the floor of the hotel room.  This is a reasonably accurate description

of the discrepancies in the testimony, and Harris used it to point out that it would make no sense for

Harris to sleep on a floor when he had a comfortable house not far away and could stay with a

family member. [Trial Tr. 321].

143.  This is acceptable advocacy.  Cook has not pointed out exactly what Harris's supposed

mis-statements were, and it appears the closing argument was, in general, an accurate description

of the witnesses's respective testimony.  In addition, the Court instructed the jury, both at the

43

beginning of trial and at the end, that closing arguments are not evidence and the jury should give them only such weight as they think proper. [Trial Tr. 5, 310].

K.

*Cumulative Error*

144. Finally, Cook argues that the cumulative effect of Harris's many mistakes, including his failure to conduct a proper pretrial investigation and failure to perform to professional standards at trial, had a detrimental effect on the outcome. The Government denies that Harris's performance had the cumulative effect of denying Cook a fair trial; it notes that the evidence against Cook was overwhelming and that defense counsel did his best to mount a defense in the face of such evidence.

145. The Court conducted a detailed review of each claim of ineffectiveness and found only two instances, of the eleven grounds cited by Cook, of what might be termed attorney error: the handling of Cook's prior conviction, and the mis-statement of Cook's name in the closing statement. In both of these instances, the Court found that the mis-step by counsel was not prejudicial to Cook's defense. The second error was so minor as to be insignificant. The first was found by the Court to be non-prejudicial.

146. "[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990). In this case, as in Spears v. Mullin, 343 F.3d 1215, 1250 (10th Cir. 2003), the cumulative of the presumed errors "is insufficient to create a reasonable probability that, but for those errors, the jury would not have convicted" the defendant.

Conclusion

147. Harris provided constitutionally adequate representation. The defense theory was focused on Cook's assertion that although he knew about the large amount of marijuana, and in fact

44

possessed a small amount that he purchased from Gilkey for his personal use, he was unaware that

his co-defendants possessed methamphetamine and that they were intending to sell drugs in Hobbs.

Harris vigorously cross examined the co-defendants on the benefits they would receive for their plea

bargains and testimony against Cook, and he was successful in having a lesser offense of simple

possession of marijuana placed before the jury as an option.  Harris's performance wasn't perfect,

but that is not the test of constitutional effectiveness.  The Court finds no ground for habeas relief

based on ineffective assistance of counsel.

### Recommended Disposition

That the Motion to Vacate be denied and this case be dismissed with prejudice.


_Lorenzo F. Garcia_
_____
Lorenzo F. Garcia
Chief United States Magistrate Judge